# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JACKIE E. BROOKS,        )
                               )
       Plaintiff,          )
v.                            )        NO. 3:05-0446
                               )        JUDGE HAYNES
CITY OF SPRINGFIELD, TENNESSEE,    )
                               )
       Defendant.        )

## MEMORANDUM

Plaintiff, Jackie E. Brooks filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, et seq. ("THRA"), against the Defendant, the City of Springfield, Tennessee, his former employer. Plaintiff asserts claims that the City subjected him to a hostile work environment, disparate treatment in the terms and conditions of his employment and retaliated against him after he filed an administrative charge about the Defendant's discriminatory conduct. The Defendant filed an answer denying Plaintiff's allegations, and the parties proceeded with discovery.

Before the Court are the parties' motions for summary judgment.[1] The Defendant filed a supplemental and renewed motion for summary judgment (Docket Entry No. 100) contending, in

---

[1] On September 10, 2006, the Plaintiff filed a motion for a stay of the proceedings, including pending dispositive motions (Docket Entry No. 72), to enable Plaintiff to exhaust his administrative remedies in response to the Plaintiff's then recent termination. On September 11, 2006, the Court granted Plaintiff's motion and administratively closed the action, but allowed the parties to reopen upon motion by either party. (Docket Entry No. 74). On November 25, 2006, Plaintiff filed a motion to reopen this action (Docket Entry No. 75) that was granted on December 1, 2006. (Docket Entry No. 78). The parties incorporate by reference their earlier memoranda (Docket Entry Nos. 36, 42, 53, 63 ) and related attachments.

sum, that:(1) Plaintiff's claims under the THRA and 42 U.S.C. § 1983 are barred by applicable statutes of limitations; and (2) Plaintiff has not established a prima facie showing of disparate treatment, hostile work environment or retaliation.

In response (Docket Entry No. 123), Plaintiff contends that: (1) his claims under the THRA and 42 U.S.C. § 1983 are timely as the Defendant engaged in continuing violations of those statutes (2) Plaintiff's proof satisfies the prima facie showing of disparate treatment, hostile work environment and retaliation; and (3) Plaintiff's proof show that the City's stated reasons for their decisions are pretext and for unlawful discrimination.

In his renewed motion for partial summary judgment (Docket Entry No. 94), Plaintiff contends in sum, that the undisputed evidence establishes retaliation and asserts that the Defendant did not show that it would have taken the same adverse actions against the Plaintiff, had Plaintiff not filed an EEOC charge. Further, Plaintiff contends that even if Defendant has submitted a nondiscriminatory explanation for the adverse employment actions, that explanation is pretextual for unlawful retaliation.

In response (Docket Entry No. 119), Defendant asserts that: (1) the record does not establish any "direct proof" of retaliation against Plaintiff after filing his EEOC charge; and (2) the record does not establish that the alleged adverse employment action would not have occurred had Plaintiff not engaged in a protected activity.

### A. REVIEW OF THE RECORD[2]

---

[2] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986), app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v.

Brooks, an African American, began as a meter reader with the City in 1997. (Docket Entry No. 120, Defendant's Response to Plaintiff's Statement of Undisputed Fact at ¶¶ 2, 3; Docket Entry No. 54, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 1). During Brooks's tenure, Terry Atchley, a utility services supervisor, was Brooks's immediate supervisor. Id. at ¶¶ 4, 5. Atchley was responsible for the department in which Brooks and other meter readers worked. Id. at ¶ 8. During the relevant time period, Bobby Lehman, the City recorder, served as Atchley's immediate supervisor. Id. at ¶ 9. Lehman's supervisor is the city manager, who is supervised by the mayor and alderman of the City. Id. at ¶¶ 14, 15.

During Brooks's employment as a meter reader, the City had four (4) meter readers, including Brooks. (Docket Entry No. 54, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 4). Each meter reader is responsible for reading the usage of the City's gas, electric and water customers once per billing cycle. Id. at ¶ 6. As a meter reader, Brooks described his duties to include:

> pump the meters out that are full of water, let people know if they're having any problem such as a water leak or any other such problem, leave notes telling them a little but about the problem...cut bushes around meters... [or] dig out meters that are temporarily covered up with mud.

(Docket Entry No. 55, Brooks Deposition at pp. 13, 14). Brooks worked Monday through Friday from 7:30 a.m. until 4:30 p.m., with an hour break for lunch, a fifteen minute break in the morning and a fifteen minute break in the afternoon. Id. at pp. 14, 15.

Each meter reader is assigned a separate route. (Docket Entry No. 54, Plaintiff's

---

Liberty Lobby, 477 U.S. 242, 247-52, (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Because there are not material factual disputes, this section does not constitute findings of fact under Fed. R. Civ. P. 56(d), except for Plaintiff's retaliation claims.

Response to Defendant's Statement of Undisputed Fact at ¶ 8).  The meter readers work independently, but if one meter reader finishes his route early, that meter reader may be asked to assist another in completing his route.  Id. at ¶ 9.  The meter readers have identical job duties and responsibilities, but routes differ as to length or driving time.  Id. at ¶ 5.  Some routes take longer than others because of the number of meters or the distance between meters on the route.  Id. at ¶ 10.  Prior to August, 2004, meter readers' routes were rotated with meter readers who completed one route beginning the next route at the top of the list.  Id. at ¶¶ 9, 18.  After August, 2004, meter readers were assigned different routes each billing cycle.  Id. at ¶ 19.

The meter reader records the readings into an electronic device called an FLX 23 or "handheld".  Id. at ¶ 11.  After completing a route, the meter reader uploads the information from his handheld to the City's computer system.  Id. at ¶ 12.  Once the information from the completed route is uploaded, the meter reader is provided the address of the new meters and the types of meters on his next route.  Id. at ¶¶ 13, 14.  The information on a handheld can be printed as a "time-tag report" that lists the account number, customer name, customer address and meter identification number.  Id. at ¶¶ 15, 16.  A time-tag report also records the time when a particular meter was read.  Id.  The reliability of the handheld is a disputed measure of work performance.  Id. at ¶¶ 16, 17.   According to Brooks, a time-tag report does not accurately reflect the time it takes for a meter reader to move from one meter to another, nor does the handheld account for traffic delays, inclement weather, locked gates, and refueling.  Id. at ¶ 17.

In addition to the handheld, meter readers must keep a route log recording of: (1) the route number; (2) the date and time the meter reader started his route; (3) the initials of the meter reader who started the route; (4) the date and time the meter reader finished his route; and (5) the

4

initials of the meter reader who finished the route. Id. at ¶¶ 20, 21. From January 2003 through February 2006, Atchley used the route logs to determine a meter reader's speed. Id. at ¶ 22. According to Atchley's calculations, Brooks read meters more slowly than two other meter readers, but read routes more quickly than another. Id. at ¶¶ 24, 25, 26, 27. Brooks contends that Atchley does not account for accuracy or reflect differences in the routes themselves. Id.

Each year, employees receive performance appraisals that evaluate their performance for the preceding year. Atchley, Brooks's immediate supervisor, completed Brooks's annual employee performance appraisal report. Id. at ¶ 28. Atchley would also recommend any disciplinary action. Id. On October 20, 2003, Lehman and Atchley gave Brooks a written warning that he was taking too long to read the routes and that he failed to account for his time. Id. at ¶¶ 30, 31. Atchley states that he gave Brooks a verbal warning in early November, 2003 on his job performance, id. at ¶ 32, but Brooks does not recall such a warning. Id.

The City contends that Brooks's performance did not improve during the period of December 9, 2003 through December 20, 2003. Id. at ¶ 33. The City cites December 16, 2003 when Brooks read meters for a total of two hours and four minutes; December 23, 2003 when Brooks read meters for a total of two hours and twenty-one minutes; and December 29, 2003 when Brooks read meters for a total of one hour and thirty-eight minutes. Id. at ¶¶ 34, 35, 36. On those occasions Brooks was paid for a full eight-hour day. Id.

Brooks denies that his performance during this period was deficient and challenges the City's methods to evaluate performance for their failure to account for variables that effect reading times, such as inclement weather, as on the dates in question. Id. at ¶¶ 33, 34, 35, 36. According to Brooks, meter readers were not required to work when it rained, and on such

5

occasions in 2003, meter readers were not required to report to any location. (Docket Entry No. 55, Brooks Deposition at p. 23). In 2003, the meter reader had the discretion to determine whether the rain was significant enough to prevent the performance of his duties. Id. at p. 24. In 2005, an inclement weather policy required meter readers to remain on the assigned route to see if the weather subsided and if the bad weather persisted, readers were to fill their gas tanks and return to City Hall. Id. at pp. 23-24.

Brooks insists that he was subject to one instance of overt racial harassment. According to Brooks, he heard Atchley mimicking the preaching style of African American ministers. Brooks states:

> Just passing by Terry Atchley and he said, uh-huh, like that. And I take that to be that when black preachers preach sometimes do that. I'm not one. But that is the first time that I noticed. And I take that as being a racial comment. Other than an actual comment, it's not so much as what– say the things that you're doing different from others.

(Docket Entry No. 124, Brooks Deposition at p. 87). Brooks admitted this was the only instance of overt racial harassment and cannot recall when this occurred. Id.

In January, 2004, upon Atchley's recommendation, the City suspended Brooks for two days without pay, citing Brooks's substandard work. (Docket Entry No. 54, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 29). On January 8, 2004, Brooks filed a charge[3] alleging racial discrimination and harassment with the Equal Employment Opportunity Commission ("EEOC") for the city manager's suspension of him for "substandard work." (Docket Entry No. 120, Defendant's Response to Plaintiff's Statement of Undisputed Fact at ¶¶

---

[3] Charge No. 253-2004-00969 (Docket Entry No. 38-7, EEOC Charges at p. 1).

16, 17, 21). In this charge, Brooks asserted:

> I HAVE BEEN EMPLOYED WITH THE CITY OF SPRINGFIELD FOR
> SEVEN YEARS WHERE I AM INCUMBENT IN THE POSITION OF METER
> READER. I HAVE BEEN SUBJECTED TO HARASSMENT, AND
> SUSPENDED.
>
> THE CITY MANAGER ADVISED ME THAT THE REASON FOR THE
> SUSPENSION WAS FOR SUBSTANDARD WORK; NO REASON WAS
> GIVE[N] FOR THE HARASSMENT.
>
> I BELIEVE THAT I HAVE BEEN DISCRIMINATED AGAINST BECAUSE
> OF MY RACE (BLACK)...
>
> BLACKS AS A CLASS ARE TREATED IN A DISCRIMINATORY MANNER
> IN ALL ASPECTS OF EMPLOYMENT.

(Docket Entry No. 38-7, EEOC Charges at p. 1).

For the racial harassment, Brooks cites Atchley or Lehman requiring him to report to the office when white employees have not been asked to report for similar offenses and that he was suspension without pay. (Docket Entry No. 55, Brooks Deposition at pp. 35-36). On his reasons for filing the EEOC charge, Brooks explained:

> ... I felt like I had been discriminated in that I was suspended for two days without
> pay for days that it rained. And the other employees, nobody else was suspended
> for not working in the rain.
>
> I filed the charges because I felt I was discriminated against in that I was treated
> different and that I had to bring a doctor's excuse for any day that I was out. The
> bylaws state that if any employee is out five days or more in one year, they are
> allowed to do that. But all the meter readers had missed at least five days, not
> only the meter readers, but my supervisor and most of the people in our
> department that work outdoors. But I was the only one that was made to bring a
> doctor's excuse for every day that I would be out.
>
> I just believe that I was discriminated against in that I was treated different. I was
> harassed and I was called in the office at times that I felt that I shouldn't have
> been called into the office and continuously asked about different times, which at
> the time I would not have been able to answer.

(Docket Entry No. 38-3, Brooks Deposition at pp. 25-26).

On January 21, 2004, Brooks and Lehman had the following exchange regarding

Brooks's suspension without pay:

> Brooks: I'm going to get my money.  I better get paid for those two days.
>
> Lehman: I hope you keep your job, Jackie.
>
> Brooks: I hope you keep yours.
>
> Lehman: I'm not worried about mine.  I'm not worried about mine.  I do my work.
>
> ***
>
> Lehman: No, I do my work.
>
> Brooks: You think you are indispensable.
>
> Lehman: No, I don't.
>
> Books: You think you're untouchable but you're going to see that you ain't.
> You're going to see that you ain't.  You'll find out.
>
> Lehman: You be sure you keep working.
>
> Brooks: But you be sure you keep working.

(Docket Entry No. 124, Plaintiff's Response to Defendant's Supplemental Statement of

Undisputed Fact at ¶ 18).  Brooks took this conversation to mean that his job was at risk based on

this exchange, not because of his job performance.  Id. at ¶¶ 19, 20.

Brooks also received warnings for time he allegedly spent "off route" according to his

handheld and was asked to provide a doctor's note for his sick leave.  (Docket Entry No. 55,

Brooks Deposition at p. 36 and Docket Entry No. 124, Plaintiff's Response to Defendant's

Statement of Undisputed Fact at ¶ 1).  The City tracked Brooks using the information entered

8

into his handheld, but allowed a white meter reader to abstain from using the handheld. Id. As a result, the City cannot determine whether that white employee was on or off route. Id. According to Brooks, white employees, including Judy Harp, missed more work than he, but have not been required to provide a doctor's note. (Docket Entry No. 124, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 2).

In 2003, to defend his whereabouts, Brooks created his own daily log recording traffic delays, restroom breaks, getting gas, and additional driving time to return to his route. Id. and Docket Entry No. 124, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 1. Brooks also cites differences in discipline for other City meter readers:

> I've been called in [the office] for some things that I shouldn't. I made note of the fact that some of our newer meter readers have been having problems on their reading. And instead of calling them into the office by theirselves like I was, [Atchley and/or Lehman] call all the meter readers into the office to question a problem that only two was actually having.

Id.

After his first charge, the EEOC requested the City to furnish information on Brooks's January 2004 charge for the period of October 1, 2003 through January 15, 2004. (Docket Entry No. 120, Defendant's Response to Plaintiff's Statement of Undisputed Facts at ¶ 18). The City complied with this request on February 16, 2004 and provided a position statement and related documents. Id. at ¶ 19. The City took the position that Brooks was suspended for "not doing his job," and "for 'substandard work.'" Id. at ¶ 20.

Some time after Brooks filed his EEOC charge, Atchley followed Brooks on three or four occasions, to track his whereabouts during the work day. (Docket Entry No. 124, Plaintiff's Response to Defendant's Supplemental Statement of Undisputed Fact at ¶ 21). On one of these

9

trips, Brooks observed Atchley outside his house when Brooks returned home to use the restroom and retrieve an item he had left there. Id. at ¶ 22. In other instances, Atchley followed Brooks while Brooks was working. Id. at ¶ 23. Brooks is unaware of Atchley following any other meter readers during the day. Id. In addition, after filing the EEOC charge, Brooks contends that he was written up for running out of gas while working the industrial route. Id. at ¶ 47. Brooks cited other meter readers who ran out of gas, but did not receive write-ups. Id. at ¶ 48. This disciplinary action is not in Brooks's employment file and the City denies any write-up for this incident. (Docket Entry No. 124, Plaintiff's Response to Defendant's Supplemental Statement of Undisputed Fact at ¶ 151).

In 2004, Brooks's score on his employee performance appraisal did not warrant a merit raise. (Docket Entry No. 54, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 40). According to Brooks, Atchley sought to lower his evaluation to preclude Brooks from a raise. (Docket Entry No. 124, Plaintiff's Response to Defendant's Supplemental Statement of Undisputed Fact at ¶ 7). In his 2004 performance evaluation, Atchley wrote that Brooks needed to increase his number of meter reads to 20 routes per month. Id. at ¶ 128.

On June 21, 2004, Brooks filed another EEOC charge[4] for harassment and retaliation for his filing of the January 2004 EEOC charge. (Docket Entry No. 120, Defendant's Response to Plaintiff's Statement of Undisputed Fact at ¶¶ 22, 23). The June 2004 charge cited increased scrutiny of Brooks after filing his first EEOC charge and "an unfair evaluation on June 14, 2004" and denial of a raise. Id. at ¶ 23. Brooks asserted:

I. After the filing of my first charge of discrimination on January 8, 2004 I have

_____

[4] Charge No. 253-2004-02562. (Docket Entry No. 38-7, EEOC Charge, June 21, 2004).

10

been subjected to harassment in that I have been watched more but not by my supervisor, received an unfair evaluation on June 14, 2004 and denied a raise. I have been employed with the City of Springfield since May 12, 1997.

II. I spoke with my supervisor, Terry Atchley, who admitted to following me but offered no explanation. Regarding my evaluation, he said nothing changed.

III. I believe I have been retaliated against for filing a previous charge of discrimination (253-2004-00969) in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Docket Entry No.38-7, EEOC Charges at p. 2).

Another cited discriminatory act was the City's failure to provide Brooks with a new truck when older trucks were replaced. In 2006, the City replaced two trucks that were taken out of service. (Docket Entry No. 124, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶¶ 122, 126). Two white employees received new trucks. Id. at ¶ 126. Based on their seniority, Brooks insists that he and another African American meter reader should have received the new trucks. The City does not have a such a seniority based policy. (Docket Entry No. 124, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 125). Neither Atchley nor Lehman selected the meter reader to receive a new vehicle. Id. at ¶ 123. Ricky Harris, the City's fleet manager assigns trucks and decided which meter reader received a new truck. Id. at ¶¶ 122, 124. Brooks insists that Atchley and Lehman did have some control over which employees received the truck. Id.

On February 3, 2006, Brooks was in his personal vehicle on his cellular telephone at 4:15 p.m., before his work day ended. (Docket Entry No. 124, Plaintiff's Response to Defendant's Supplemental Statement of Undisputed Fact at ¶ 148). Atchley and Brooks had an interaction on Brooks's telephone use during working hours when Atchley stated Brooks should have been in

11

the break room or in Atchley's office.  Id.  According to Brooks, Atchley initiated the

confrontation and exhibited physically threatening behavior precluding Brooks from closing his

truck door.  Id. Brooks insists that previously a meter reader's activities in the time between

returning their handheld devices and the end of the City's workday, never mattered.  Id.  Atchley

contends that Brooks became belligerent and that Brooks threatened him with physical harm.

(Docket Entry No. 124, Atchley Deposition at pp. 48-50).  Atchley insists he was checking

whether Brooks had completed his route and informing Brooks that he needed to complete

paperwork on Brooks's sick leave.  Id. at p. 50.  Atchley issued Brooks a written warning

regarding this incident.  (Docket Entry No.124, Plaintiff's Response to Defendant's

Supplemental Statement of Undisputed Fact at ¶ 148).

On May 12, 2006, Atchley's performance appraisal of Brooks for the previous year was

that Brooks was not using his time well, had a poor attitude, did not use comments properly and

lost a handheld device.  Id.  at ¶ 153.  On May 19, 2006, Lehman placed Brooks on an immediate

90-day probation, citing Brooks's continued lack of motivation and poor job performance.  Id. at

¶ 105.  At that time, Lehman notified Brooks that he could be terminated, if his job performance

did not improve.  Id.

On July 28, 2006, Atchley met with Brooks to discuss his continuing lack of speed in

completing his route.  Id. at ¶ 155.  Atchley noted Brooks's  improvement in some areas, but

described Brooks's lack of the desired speed and that Brooks took too many breaks.  Id.  Atchley

gave Brooks until the end of his probation period, August 22, 2006, to improve on these subjects.

Id.  On August 14, 2006, Atchley met with Brooks who tape recorded the meeting.  Id. at ¶ 156.

The conversation was about Brooks's continued performance problems.  Id.

12

Brooks was terminated on August 22, 2006 for failure to improve adequately during his probation period. Id. at ¶ 106. Lehman acknowledged that Brooks had improved, but determined that termination was warranted because Brooks's improvement was three to four weeks before the expiration of his probationary period. Id. at ¶ 107. Upon his termination, Lehman instructed Brooks that he could file a grievance with the City, but Brooks decided not to, believing that the City would not treat him fairly in the grievance process. Id. at ¶ 65. On September 7, 2006, Brooks filed another charge with the EEOC alleging that his termination was the result of unlawful retaliation for engaging in protected activities.

## B. CONCLUSIONS OF LAW

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

13

judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.

> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But</u> <u>see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

14

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

15

If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.

* * *

> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed</u>.'

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must

be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>,

16

791 F.2d. 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a

summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some

references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of

undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and

other authorities on summary judgment and synthesized ten rules in the "new era" on summary

judgment motions

> 1.    Complex cases are not necessarily inappropriate for summary judgment.

> 2.    Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

> 3.    The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

> 4.    This burden may be met by pointing out to the court that the respondent,

17

having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under

18

the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

As a threshold matter, the Court addresses first the City's statutes of limitations defense that Brooks complains of discrete acts that are subject to a one year statute of limitations under the THRA and 42 U.S.C. § 1983.

Plaintiff's claims under the THRA and § 1983 were filed on February 23, 2006. (Docket Entry No. 19, Amended Complaint). The THRA and § 1983 have a one year statute of limitations. Tenn. Code Ann. § 4-21-311(d); Tenn. Code Ann. § 28-3-104(a)(3); see also Berndt v. Tennessee, 796 F.2d 879, 883 (6th Cir.1986). Defendant insists that Brooks's claim about the City requiring a medical excuse for sick days is time barred. (Docket Entry No. 101, Defendant's Memorandum in Support of its Supplemental and Renewed Motion for Summary Judgment at p. 23).

The Sixth Circuit has set forth criteria for determining whether a particular act is barred by the statute of limitations:

> The date on which the statute of limitations begins to run in a § 1983 action is a question of federal law. Sevier v. Turner, 742 F.2d 262, 272 (6th Cir.1984). Ordinarily, the limitations period starts to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." Id. at 273. "In determining when the cause of action accrues in section 1983 actions, we have looked to what event should have alerted the typical lay person to protect his or her rights." Dixon v. Anderson, 928 F.2d 212, 215 (6th Cir.1991).

> Kuhnle Bros., Inc. v. County of Geauga, 103 F.3d 516, 520 (6th Cir.1997). The exceptions to that rule are two: where the plaintiff can show prior discriminatory activity that continues into the present, as opposed to prior discriminatory activity whose effects continue into the present, see Tolbert v. State of Ohio Dept. of Transp., 172 F.3d 934, 940 (6th Cir.1999); and where the plaintiff can show "a longstanding and demonstrable policy of discrimination." Dixon, 928 F.2d at 217.

Bell v. Ohio State Univ., 351 F.3d 240, 247 (6th Cir.2003). In a word, "[a] discrete retaliatory or

19

discriminatory act 'occurred' on the day that it happened.'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002).

Here, any discrete act occurring prior to February 23, 2005 is outside of the limitations period of the THRA and 42 U.S.C. § 1983 and cannot be considered absent Brooks's assertion of the continuing violation doctrine. Defendant notes that Plaintiff became aware of this alleged discrimination in requiring medical proof for sick leave on November 18, 2003 as he refused to sign the Lehman memorandum of that date. Thus, this claim cannot be retaliatory as Brooks filed his first EEOC charge in January 2004. Defendant also notes that "Plaintiff does not even make any allegations in regards to this allegedly discriminatory discipline or anything similar in the Complaint filed on June 7, 2005, the Amended Complaint filed on February 23, 2006 or the Second Amended Complaint filed most recently on December 1, 2006.

"A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." Tolbert v. Ohio State Dept. of Trans., 172 F.3d 934, 940 (6th Cir.1999) (citing National Advertising Co. v. City of Raleigh, 947 F.2d 1158, 1166 (4th Cir.1991)); see Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n. 15 (1968) (finding action not time-barred due to "a continuing violation ... which inflicted continuing and accumulating harm"). A continuing violation occurs where: (1) a defendant's wrongful conduct continues after the precipitating event that began the pattern; (2) injury to the plaintiff must continue to accrue after that event; and (3) further injury to the plaintiffs would have been avoidable if the defendants had at any time ceased their wrongful conduct. Id.

The Court concludes however, that the City's requirement that Brooks provide a doctor's note for each absence is not a continuing violation although Brooks was required to support each

20

absence with a doctor's note, this requirement was based upon a single decision about which Books was well aware. Brooks did not tell the Defendant until June 7, 2005 that he intended to use the City's doctor's excuse requirement as evidence of disparate treatment. Thus, this claim is time-barred, but Brooks can rely on the doctor's excuse requirement as evidence of hostile work environment and/or disparate treatment.

### Plaintiff's Remaining Claims

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race..." 42 U.S.C. § 2000e-2(a)(1). As discussed infra, the THRA and Section 1981 are similarly interpreted. Plaintiff asserts that the City violated federal employment laws by: treating him differently than non-African American employees; creating and allowing a hostile work environment to exist; and retaliating against him for engaging in a protected activity. The Court will discuss each of Plaintiff's allegations in turn.

### Disparate Treatment

Under Title VII, an employer cannot discriminate against any individual with respect to the employee's compensation, terms, conditions or privileges of employment, because of such individual's race. 42 U.S.C. § 2000e-2(a)(1). "In a disparate treatment case, liability depends on whether the protected trait [here, race] actually motivated the employer's decision...a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993). Here, Brooks claims that the City treated him differently than it had treated other meter readers based upon his race.

21

The language of Title VII "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment..." Harris v Forklift Systems, Inc., 510 U.S. 17, 20 (1993) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986)).

> "A prima facie case of disparate treatment under Title VII must establish by a preponderance of the evidence that the defendant took action affecting the plaintiff's compensation, terms, conditions or privileges of employment under circumstances which give rise to an inference of unlawful discrimination... Thus, the prima facie case focuses upon the primary factual inquiries of any disparate treatment case: "'[whether] the defendant intentionally discriminated against plaintiff'", and whether the employer treats people less favorably than others because of race...

Beaven v. Com. of Ky., 783 F.2d 672, 675-76 (6th Cir.1986) (internal citations omitted).

"[A] plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." Kline v. Tennessee Valley Authority, 128 F.3d 337, 348-49 (6th Cir.1997). Yet, "[t]he direct evidence and circumstantial evidence paths are mutually exclusive...If a plaintiff can produce direct evidence of discrimination then the McDonnell Douglas-Burdine paradigm is of no consequence. Similarly, if a plaintiff attempts to prove its case using the McDonnell Douglas-Burdine paradigm, then the party is not required to introduce direct evidence of discrimination." Id. Here, Plaintiff relies upon circumstantial evidence to prove discrimination.

A plaintiff may create a presumption of discrimination when he establishes the following elements of his prima facie case by a preponderance of the evidence: (1) membership in a

22

protected class; (2) that he suffered from an adverse action; (3) that he was qualified for the position; and (4) that he was treated differently from similarly situated people outside of the protected class. <u>Alexander v. Local 496, Laborers' Intern. Union of North America</u>, 177 F.3d 394, 402-03 (6th Cir.1999) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)). If the Plaintiff establishes his <u>prima facie</u> case, the Defendant may offer any legitimate, non-discriminatory reason for the action, which Plaintiff may then rebut with evidence of pretext. <u>Id.</u> at 403 (citing <u>Hartsel v. Keys</u>, 87 F.3d 795, 800 (6th Cir.1996). The burden at all times, remains with the Plaintiff. <u>Id.</u> Here, it is undisputed that Brooks meets the first, second and third elements of a <u>prima facie</u> showing of disparate treatment. Yet, the City contends that Plaintiff cannot satisfy the fourth element; that he was treated differently than similarly situated people outside of the protected class.

Here, Brooks must identify other employees who are "similarly situated in <u>all respects</u>" to him. <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir.1992) (emphasis in original). The individuals to whom Brooks must compare himself "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Id.</u> The Sixth Circuit later clarified the <u>Mitchell</u> standard stating:

> Courts should not assume ... that the specific factors discussed in <u>Mitchell</u> are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather...the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects."

23

McMillan v. Castro, 405 F.3d 405, 413-14 (6th Cir.2005) (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 351 (6th Cir.1998)).

Throughout Brooks's employment as a meter reader, the following employees were meter readers: Cody Roberts, David Traughber, Anthony Johnson, Jason Young, Darryl Bilyeu, Randall Jones, Kevin Ashabraner, and Mickey Rob who are White. (Docket Entry No. 69, Defendant's Response to Plaintiff's Additional Statement of Undisputed Fact at ¶¶ 54, 56). Like Brooks, these employees were all subject to the same job description and duties and shared Atchley as their supervisor. Id. at ¶¶ 55, 85. In addition to Brooks, Jerry Tyler, an African-American was also a meter reader during Brooks's employment. (Docket Entry No. 54, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 27).

Plaintiff contends that individuals occupying the position of "Tech II" were similarly situated. The Court disagrees. Although they shared the same supervisor, Atchley, and sometimes read meters, a Tech II's job duties differed significantly. To be sure, a Tech II is responsible for the installation, maintenance and repair of meters. According to Plaintiff, a Tech II is similarly situated under Singfield v. Akron Metro. Housing Auth., 389 F.3d 555 (6th Cir.2004) and Seay v. Tenn. Valley Auth., 339 F.3d 454 (6th Cir.2003). The Plaintiff is mistaken. While these cases do stand for the proposition that Mitchell is not to be narrowly construed, they do not hold that if two individuals with different job titles have one shared responsibility that they can be considered similarly situated. These decisions all state that a court must consider all relevant aspects of one's employment in order to determine a similarly situated employee. Here, Brooks is contending that the various criticisms of his job performance constituted disparate treatment, contributed to a hostile work environment, and were the pretext

24

upon which a retaliatory discharge was based. It follows then, that someone who does not perform the same tasks will not held to the same standards. In addition, there is no proof to the contrary. Thus, while Brooks's job is to read meters, a Tech II has other responsibilities that necessarily subject the Tech II to different meter reading expectations, such as number of routes, times meters are read, etc..

For his disparate treatment claim, Brooks cites: (1) he was subject to individual meetings with Atchley and/or Lehman in which his job performance was criticized and his whereabouts questioned; (2) he was instructed to read 20 routes per month on his annual performance appraisal; (3) he has been counseled over going to his home during the workday; and (4) he has been counseled over taking too many sick days. According to Brooks, similarly situated Caucasian employees have not been subject to the same treatment.

The Court concludes that Brooks fails to identify a comparable employee who engaged in the same sort of behavior, but was not called into a private meeting with Atchley and/or Lehman. When Brooks met privately with Atchley and/or Lehman, the topic of discussion centered around Brooks's productivity and use of sick time. (Docket Entry No. 124, Plaintiff's Response to Defendant's Statement of Undisputed Fact at ¶ 94). Essentially, Brooks's supervisors suspected him of abusing sick leave. Plaintiff does not deny his use of significant amount of sick time that he earned and had not exhausted. Id. By November 2003 (when Lehman first required that Brooks bring a doctor's note for sick days) Brooks had used 130.5 hours of sick leave for the year. Brooks's then-fellow meter readers Tyler, Bilyeau and Johnson had used 96, 51 and 83 hours respectively. Id. at ¶ 93. Brooks has used over 16 sick days, Tyler used 12, Bilyeau used six, and Johnson used more than ten sick days. Brooks has used more than three weeks of sick

25

time, while Tyler has used two weeks and two days, Bilyeau used a week and one and a third days, and Johnson used two weeks and one-third day. Tyler, who is an African American had the next highest number of sick days. Brooks has used more than two weeks more sick time compared to the meter readers who are white. Thus, Brooks cannot establish his prima facie case on this claim.

As to the requirement that Brooks read at least 20 routes per month in June 2004, this is based upon the evaluation of the period from May 12, 2003-May 12, 2004. See Docket Entry No. 38-11, Performance Evaluation June 2004. Brooks does not identify a white meter reader who was directed to "[b]etter utilize time" by reading "at least 20 routes per month." Brooks has not shown a white meter reader who received an unfavorable evaluation on time utilization (as Brooks had) and who was not required to increase his routes to at least 20 routes per month. The proof is that the other meter readers did not have time management issues and cannot be considered similarly situated. See Docket Entry No. 54, Personnel Files of Johnson, Roberts, Bilyeu, and Young.

As to Brooks being singled out for going home during the work day, Brooks does not deny that he periodically returned to his residence to eat his lunch or use the restroom. Brooks does not identify a non-protected employee who also visited his residence during the work day who was not counseled regarding this behavior.[5] The Court concludes that Brooks cannot establish a prima facie case of disparate treatment on this claim.

### *Hostile Work Environment*

———————————

[5] As stated earlier, the Court does not deem an employee performing the job duties of a Tech II to be similarly situated to an employee who exclusively reads meters, like Brooks.

26

For this claim, Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

To establish a prima facie case of hostile work environment[6], the Brooks must demonstrate: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment created a hostile work environment; and (5) the City is vicariously liable. See Hafford v. Seidner, 183 F.3d 506 (6th Cir.1999). The City concedes that Brooks is a member of a protected class. For the purposes of its motion, the City disputes that Plaintiff can satisfy the third and fourth elements of his prima facie case of hostile work environment.

Harassment affects a "term, condition or privilege of employment" if the conduct is severe or pervasive enough to alter the conditions of the plaintiff's employment and creates an abusive working environment. Harris, 510 U.S. at 21-22. For conduct to qualify as having created a hostile work environment, both an objective and subjective test must be met:

> "[M]ere utterance of an ... epithet which engenders offensive feelings in a [sic] employee," Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment– an environment that a reasonable person would find hostile or abusive– is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

---

[6] The elements of the prima facie case of hostile work environment are the same, regardless of the discrimination context in which the claim arises. Hafford, 183 F.3d at 512.

Case 3:05-cv-00446  Document 138  Filed 07/24/08  Page 27 of 36 PageID #: 3029

<u>Harris</u>, 510 U.S. at 21-22.

To determine whether the objective and subjective tests are met, the Court must examine the totality of the circumstances.

> [W]hether an environment is "hostile" or "abusive" can be determined only be looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance... no single factor is required.

<u>Id.</u> at 23.

Here, Brooks asserts: (1) he has been subjected to individual meetings with supervisors involving job performance; (2) he has been under observation to determine whether he was at his residence during the workday; (3) that the inclement weather policy was implemented after he failed to report to Atchley's office or the City's break room; (4) that a confrontation between himself and Lehman culminated in threats of termination; (5) unfavorable performance evaluations in 2004 and 2005; and (6) he was required to provide a doctor's note to substantiate each sick day taken. Brooks insists that these incidences, taken together, constitute a hostile and abusive work environment in violation of Title VII, THRA and § 1981.

Taking Plaintiff's allegations as true, Plaintiff's claim for a hostile work environment fails. First, Brooks proved that the harassment was based upon his race. The only example Brooks provides of racial harassment is when Atchley allegedly mimicking the preaching style of African American ministers. According to Brooks:

> Just passing by Terry Atchley and he said, uh-huh, like that. And I take that to be that when black preachers preach sometimes do that. I'm not one. But that is the first time that I noticed. And I take that as being a racial comment. Other than an actual comment, it's not so much as what– say the things that you're doing different from others.

28

(Docket Entry No. 124, Brooks Deposition at p. 87). Assuming this was indeed a racial comment, one isolated comment cannot be considered "severe or pervasive" enough to constitute a hostile work environment. Harris, 510 U.S. at 21-22.

Brooks cites Jackson v. Quanex Corp., 191 F.3d 647 (6th Cir.1999) and Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1988) that the discrimination was based on race. Yet, in Jackson the plaintiff was exposed to racial epithets, slurs, racist graffiti and racist conduct. In Oncale, a sexual discrimination action, the plaintiff was forcibly subjected to sex-related, humiliating actions against him, in the presence of coworkers, was physically assaulted her in a sexual manner, and threatened with rape. 52 U.S. at 77. In those decisions, the plaintiff actually endured treatment that was clearly attributable to his or her race or sex. Here, the facts do not prove that the harassment Brooks was subject to work conditions based upon his race. The Court concludes that Plaintiff has not submitted proof of a racially hostile work environment to support a judgment on that claim.

### *Retaliation*[7]

Under Title VII, an employer cannot retaliate against an employee who engages in any activity protected under Title VII. 42 U.S.C. § 2000e-3(a). Title VII's prohibition against retaliation extends to the employee's opposition to any unlawful employment practice and the employee's participation in an investigation, proceeding or hearing under Title VII. Id.

---

[7] The City contends that Brooks's second amended complaint (Docket Entry No. 80) does not set forth any allegations that are premised upon Plaintiff's filing an EEOC claim or lawsuit. (Docket Entry No. 101, Defendant's Memorandum in Support at p. 30). However, the second amended complaint references the EEOC charges that included claims of retaliation and describes events that occurred after the precise dates the EEOC charges were filed.

29

To establish a prima facie case of retaliation, Brooks must show: (1) that he engaged in a protected activity (2) that the exercise of his civil rights was known to the City; (3) thereafter the City took an employment action adverse to Brooks; and (4) that there was a causal connection between the protected activity and the adverse employment action. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000). Here, first three elements of the prima facie case are undisputed.

The disagreement is whether Brooks can establish a causal connection between the protected activity– the filing of EEOC charge January 2004 and his poor evaluation that resulted in the denial of a pay increase. In his motion for partial summary judgment, Brooks presents his only claim that the City retaliated against him by giving him an unfavorable performance evaluation in June 2004. (Docket Entry No. 99, Memorandum in Support of Plaintiff's Renewed Partial Motion for Summary Judgment at pp. 1, 8, 11). It should be noted that the Plaintiff periodically contends that his two day suspension without pay was retaliatory. However, Brooks filed his first EEOC charge because he was suspended, and thus, the suspension cannot possibly be retaliatory. Id. at p. 8-9.

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." Id. "A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation... However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." Id. (citation omitted).

30

Here, Lehman admitted to being displeased that Brooks filed a charge with the EEOC rather than go through the grievance process and made his feelings known to Brooks. In his deposition, Lehman states:

> A... this is my understanding of the personnel policy and I believe I'm correct. In writing he would write up his grievance and give it to the personnel, which is Ms. Holt, give it to her and she would take care of it from there.
>
> Q. Did you happen to notice in part of the clip [of a tape recorded conversation between Lehman and Brooks] we just listened to if anybody said something like, I appreciate what you did. Did you happen to hear that?
>
> A. I didn't hear but I may have said that.
>
> Q. If you said that, do you have any idea of why you might have said that?
>
> A. Yes.
>
> Q. Why would you?
>
> A. He filed an EEOC on myself and Terry Atchley and I didn't think it was fair.
>
> *   *   *
>
> A. Well, it's sarcasm [saying that he appreciates what Brooks did].
>
> Q. Do you think a person should not go to the EEOC about difficulties they're having in the – I'm sorry, an employee[] should not go to the EEOC about difficulties they're having in the workplace?
>
> A. Let me see. I have a problem here because the first time you get disciplined you go to the EEOC and that's pretty much the way it was. I don't think it should have been that way.

(Docket Entry No. 124, Lehman Deposition at pp. 118-19).

Moreover, Brooks's proof is that Lehman signed off on the June 2004 performance appraisal that had the effect of denying Brooks a merit raise. See Docket Entry No. 38-11, Evaluation of June 2004. The City contends that Lehman signing off as department head is a

31

mere procedural step and that Lehman did not instruct or direct Atchley in his completing the evaluation.

Yet, the proof here is that Lehman was aware of Brooks's performance, as he "discuss[ed] it" with Atchley. (Docket Entry No. 97, Lehman Deposition at p. 96). In fact, Lehman and Atchley discussed Brooks's performance "during the year also" and not "just at evaluation time." Id. Although Lehman did not complete Brooks's June 2004 evaluation, he signed off on the form and consistently discussed Brooks's performance with Atchley, ostensibly to keep both supervisors on the same page. Thus, viewing the evidence in a light most favorable to Plaintiff, the proof demonstrates that Lehman was disappointed that Brooks filed an EEOC charge, and Brooks's next performance appraisal that Lehman signed off on disqualified Brooks from a merit raise.

"[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." Nguyen, 229 F.3d at 566 (citing EEOC v. Avery Dennison Corp., 104 F.3d at 861). Because the burden is minimal and the Court is required to make all reasonable inferences in favor of the nonmoving party, Court finds that Plaintiff has put forth sufficient evidence to establish a prima facie case of retaliation.

Once a Title VII plaintiff establishes a prima facie case of retaliation, the McDonnell Douglas burden shifting framework applies:

> Under the McDonnell Douglas scheme, "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254,

32

101 S.Ct. 1089, 1094 (1981). To establish a "presumption" is to say that a finding of the predicate fact (here, the prima facie case) produces "a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination). 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977). Thus, the McDonnell Douglas presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case- *i.e.*, the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254, 101 S.Ct., at 1094. "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, if believed by the trier of fact, would support a finding of unlawful discrimination was not the cause of the employment action. Id., at 254-255, and n. 8, 101 S.Ct., at 1094-1095, and n. 8. It is important to note, however that although the McDonnell Douglas presumption shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. Burdine, 450 U.S. at 253, 101 S.Ct., at 1093.

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07 (1993).

Here, the City's proof is that Brooks's poor job performance warranted his unfavorable evaluation and the denial of a raise. To be sure, Brooks's evaluations reflect that his route speed and/or time management had been a problem since his November 1997 through November 1998 evaluation. See Docket Entry No. 38-11, Performance Evaluations. The City's proof shows that Atchley and Lehman had a problem with Brooks's job performance for more than six years before his score was sufficiently low as to preclude him from receiving a merit raise. Thus, the City has produced evidence to demonstrate a legitimate, non-retaliatory reason motivated the adverse employment action, and the burden shifts to Brooks to demonstrate that the City's proffered reason is pretext for retaliation.

In Balmer v. HCA, Inc., 423 F.3d 606 (6th Cir.2005), the Sixth Circuit set forth the requirements to establish pretext:

The plaintiff must produce sufficient evidence from which the jury could

33

"reasonably reject [the defendants'] explanation" and infer that the defendants "intentionally discriminated" against her.  Woythal v. Tex-Tenn Corp., 112 F.3d 243, 246-47 (6th Cir.1997).  The plaintiff must submit evidence demonstrating that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action.  To inquire into the defendant's "honest belief," the court looks to whether the employer can establish "reasonable reliance" on the particularized facts that were before the employer when the decision was made.  Smith v. Chrysler, 155 F.3d 799, 806-7 (6th Cir.1998).

* * *

If there is no reasonable dispute that the employer made a "reasonably informed and considered decision" that demonstrates an "honest belief" in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse action was pretextual. See Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir.2001).

Id. at 614.

Plaintiff's proof is that in the six performance evaluations before the June 2004 evaluation and before Brooks's EEOC charge, Brooks's evaluation score never fell below a "3", the minimum score to receive a merit raise, until after he had filed his 2004 EEOC charge.  Time was the only area that Brooks was instructed to improve  On Brooks's 2004 evaluation there was more than one deduction for Brooks's speed and/or time management, and his score fell below a "3".  Under "Element 1 Manual Work," the criteria is that the employee be "[a]ble to perform general unskilled or semi-skilled tasks involving construction, maintenance, grounds keeping and other tasks requiring light to heavy lifting and moving; tasks are performed promptly with few mistakes and utilizing proper lifting and safety procedures; ensures that subordinates, if any, do the same." (Docket Entry No. 38-11, June 2004 Evaluation).  In the supervisor's documentation area, Atchley wrote that Brooks "does not utilize time well..." Id.  Yet, the evaluation has "Element 4 Effective Use of Time", where Atchley again noted Brooks's time problems stating

34

"[t]ime not being used well, delays starting routes, stopping early, lunch hour too long, too long between routes. Does not increase speed on routes regardless of how far behind schedule we are or how much help is needed to fill in (service men reading)." Id.

The evaluation on its face seems to deduct Brooks twice for the same type of alleged infractions. The same type of double-deduction occurred in his previous year's evaluation, but Brooks's overall score did not fall below a "3" at that point. These facts, taken together, could lead a reasonable juror to conclude that Brooks was effectively denied a merit raised, based upon a poor performance appraisal in retaliation for filing an EEOC charge. Thus, a material factual dispute exists with regard to pretext.

### THRA and 42 U.S.C § 1981 Claims

Claims brought under Title VII, THRA and § 1981 are governed by the same burden-shifting framework first espoused in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93(1973), and clarified in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 (1981). See Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992); Raines v. Shoney's, Inc., 909 F.Supp. 1070 (E.D.Tenn.1995); Bruce v. W. Auto Supply Co., 669 S.W.2d 95 (Tenn.Ct.App.1984). Thus, the above analysis and conclusions regarding the Title VII claims apply equally to the parallel claims brought under the THRA and § 1981. Wade v. Knoxville Utilities Bd., 259 F.3d 452, 464 (6th Cir.2001). As a result, Plaintiff's claims for relief for disparate treatment and hostile work environment under the THRA and § 1981 must also fail. Yet, for the reasons Plaintiff has a viable claim for retaliation under Title VII, that claim is also viable under the THRA and 42 U.S.C. § 1981.

### 42 U.S.C. § 1983 Claims/Equal Protection Claims

35

Claims brought under 42 U.S.C. § 1983 seeking relief for violations of the equal

protection clause are governed by the same burden-shifting framework as Title VII claims.

> 'To prove a violation of the equal protection clause under section 1983 , [a
> plaintiff] must prove the same elements[-e.g., that he was treated differently than
> similarly situated employees-]as are required to establish a disparate treatment
> claim under Title VII, i.e., under the McDonnell Douglas/Burdine framework.'
> Lautermilch v. Findlay City Schs., 314 F.3d 271, 275 (6th Cir.) (quoting Jachyra
> v. City of Southfield, No. 95-1009, 1996 WL 520795, at *3 (6th Cir. Sept.12,
> 1996)), cert. denied, 540 U.S. 813, 124 S.Ct. 63, 157 L.Ed.2d 27 (2003).

Singfield v. Akron Metropolitan Housing Authority, 389 F.3d 555, 566-67 (6th Cir.2004). Thus,

Brooks's claims for relief under §1983 must fail for the same reasons that his claim for relief for

disparate treatment failed under Title VII.

## CONCLUSION

For the above-stated reasons, the Court concludes that the Defendant's motion for

summary judgment should be granted in part and denied in part and the Plaintiff's motion for

partial summary judgment should be denied as material factual disputes exist on Plaintiff's

retaliation claims.

An appropriate Order is filed herewith.

Entered the 23rd day of July, 2008.

WILLIAM J. HAYNES, JR.
United States District Judge

36